**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-11930
Non-Argument Calendar
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JAMARUS DEONTAE HOSKINS,
a.k.a. Juke,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:24-cr-00154-AMM-GMB-1
_____

Before JORDAN, KIDD, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Jamarus Hoskins appeals his 97-month imprisonment sentence for (1) his conspiracy to transport, possess,

and sell stolen motor vehicles in interstate commerce; and (2) his three substantive convictions to do the same. Particularly, Hoskins challenges (1) the application of a two-level receipt-of-stolen-property increase under U.S.S.G. § 2B1.1(b)(4); and (2) the application of a four-level leadership-role increase under U.S.S.G. § 3B1.1(a).

After careful review, we reverse as to the § 2B1.1(b)(4) receipt-of-stolen-property increase but affirm as to the § 3B1.1(a) leadership-role increase. Therefore, we vacate Hoskins's sentence and remand for resentencing without the § 2B1.1(b)(4) increase.

## I. OFFENSE CONDUCT

In March 2021, the FBI began investigating a car theft ring in which thieves were stealing cars, switching or altering vehicle identification numbers ("VINs"), and selling the cars for a profit. Investigators were alerted to the group through a law enforcement portal with Carfax, which provides a monthly list of vehicles that have a high mileage reading as their first entry. This indicates to investigators that a vehicle may likely be stolen. The investigators discovered that several of the suspicious vehicles were registered to "J.D.H.," later identified as Hoskins.

During the course of the investigation, Hoskins was seen moving stolen vehicles on several occasions at a body shop and auto sales business. The FBI captured communications between Hoskins and a known co-conspirator, in which Hoskins directed the co-conspirator and others to steal vehicles from car dealerships

across the southeast and drop them off at locations Hoskins specified.  Hoskins typically selected high-end vehicles to steal.

Hoskins's co-conspirators carried out the thefts in several ways.  For example, sometimes they would pose as customers at car dealerships, ask to see a key fob for the target vehicle, receive the key fob, and drive away with the vehicle.  Other times they would enter a vehicle via an unlocked door or broken window, plug an iPad-like device into the car, use special software to program a blank key fob to start the vehicle, and drive away.

Hoskins hired (1) drivers responsible for stealing vehicles and dropping them off where Hoskins directed them; and (2) "trailers" responsible for driving behind the stolen vehicles and blocking the license plates to avoid detection by law enforcement. Hoskins would then pay others to install a fraudulent VIN on the vehicle's dash and to make a fraudulent title.  Finally, Hoskins would sell the vehicle.

Throughout the conspiracy, Hoskins stole, directed others to steal, and sold over $1,000,000 worth of vehicles.

## II.  PROCEDURAL HISTORY

### A.    Indictment

A superseding indictment charged Hoskins with one count of conspiracy to transport, possess, and sell stolen motor vehicles in interstate commerce, in violation of 18 U.S.C. § 371 (Count 1), and three counts of sale or possession of a stolen motor vehicle, in violation of 18 U.S.C. § 2313 (Counts 2, 3, and 4).

**B.    Trial**

At trial, Hoskins's co-conspirator Keshawn McCollough testified for the government. McCollough testified that Hoskins, also known as "Juke," was in charge of the conspiracy. McCollough described Hoskins as in charge of the "runners," who would steal the vehicles, after which Hoskins would "handle everything else." McCollough described himself as a "runner," and listed at least four other participants involved in the conspiracy—two runners, one "trailer," and one person whose exact role McCollough could not recall.

McCollough testified that Hoskins would call the runners with orders for a certain type of vehicle, and the runners would then steal the vehicle and call Hoskins for instructions on where to bring the vehicle and when to pick up their money. Hoskins was also responsible for paying the runners. Hoskins himself never went to steal the cars.

McCollough testified to a specific instance in which he and another runner were unable to steal the vehicle Hoskins requested and, as a result, McCollough was not paid for the theft. When they stole a different type of vehicle instead, Hoskins directed them to abandon the vehicle because Hoskins did not have a buyer for that vehicle.

Jessica Hennessey, another co-conspirator, testified to the following. She worked at a used car lot and would process fraudulent titles for Hoskins. Hoskins would ask Hennessey to apply for titles, and she would send him proof that the title transfer

was approved.  Hoskins paid her per title transferred.  Hennessey also helped coordinate the used car lot's purchase of stolen vehicles.  Hennesey and the used car lot initially bought Hoskins's cars through a middleman but later began dealing with Hoskins directly.

Later during the trial, the government introduced a message Hoskins sent from his iCloud account to a group chat of five other people.  In the message, under the heading "Juke's responsibilities," was a list that included, "Sell the cars"; "Don't get no sleep"; "Pay for room, food[,] gas"; "Type t shirts";[1] "Fix everybody credit"; "Get the paperwork"; "Deal with Clients"; "Keys"; "Think 10x ahead for us all"; "Start everybody LLC."

In the same message, Hoskins described himself as the one running the group, stating:

> Im the one going to prison at the end of the DAY FOR RUNNING A ORGANIZED CAR RING [two laughing emojis] but fuck it that's how I'm going out ……I love you all 5L and please be safe . [heart emoji] let's eat[.] [sic throughout]

The jury found Hoskins guilty in the conspiracy charge in Count 1 and the three substantive sale or possession of a stolen motor vehicle charges in Counts 2 through 4.

---

[1] FBI Agent Mason Hubber testified that T-shirts meant titles.

## C.    Presentence Investigation Report

A probation officer prepared a presentence investigation report ("PSI") for Hoskins.  The PSI assigned Hoskins a total offense level of 30, consisting of: (1) a base offense level of six for Hoskins's 18 U.S.C. § 2313 convictions, under U.S.S.G. § 2B1.1(a)(2); (2) a fourteen-level increase because the offense involved a loss amount that was more than $550,000 but less than $1,500,000, under U.S.S.G. § 2B1.1(b)(1)(H); (3) a two-level increase because the offense involved ten or more victims, under U.S.S.G. § 2B1.1(b)(2)(A)(i); (4) a two-level increase because the offense involved receiving stolen property and the defendant was in the business of receiving and selling stolen property, under U.S.S.G. § 2B1.1(b)(4); (5) a two-level increase because the offense involved an organized scheme to steal or receive stolen vehicles or vehicle parts, under U.S.S.G. § 2B1.1(b)(15)(A); and (6) a four-level increase because the defendant was an organizer or leader of a criminal activity involving five or more participants, under U.S.S.G. § 3B1.1(a).

Hoskins had a criminal history category of I.  With a total offense level of 30 and a criminal history category of I, Hoskins had an advisory guideline range of 97-121 months of imprisonment. The maximum terms of imprisonment were five years for Count 1 and ten years per count for Counts 2 through 4.

As relevant on appeal, Hoskins objected to the two-level receipt-of-stolen-property increase under § 2B1.1(b)(4) and to the four-level leadership-role increase under § 3B1.1(a).

### D.    Sentencing Hearing

At sentencing, the government called FBI Agent Mason Hubber to testify.  Hubber recounted the text messages introduced at trial in which Hoskins referred to himself as the leader of the car theft ring.  Hubber testified that there were at least five other members of the conspiracy, which he listed, and that they all identified Hoskins as the leader of the organization.

After Hubber's testimony, the district court overruled all of Hoskins's objections and adopted the advisory guidelines calculations in the PSI.  The district court imposed a sentence of 60 months of imprisonment as to Count 1 and 97 months as to each of Counts 2 through 4, all to be served concurrently.

Hoskins timely appealed.  On appeal, he challenges only his sentence.

### III.  STANDARDS OF REVIEW

"We review *de novo* the interpretation and application of the Sentencing Guidelines."  *United States v. Kluge*, 147 F.4th 1291, 1296 (11th Cir. 2025) (quoting *United States v. Dupree*, 57 F.4th 1269, 1272 (11th Cir. 2023) (en banc)).  The district court's fact findings at sentencing are reviewed under the clearly erroneous standard. *United States v. Bergman*, 852 F.3d 1046, 1070 (11th Cir. 2017).

In reviewing a district court's fact finding, "[t]he court's choice between two permissible views of the evidence will rarely constitute clear error, so long as the basis of the trial court's decision is supported by the record and the court did not misapply

8                    Opinion of the Court                    25-11930

a rule of law." *United States v. Valois*, 915 F.3d 717, 731 (11th Cir. 2019).

## IV.  ANALYSIS

### A.    Increase under § 2B1.1(b)(4)—Receipt of Stolen Property

On appeal, Hoskins argues that the district court erred in applying the two-level increase for receipt of stolen property under § 2B1.1(b)(4).

The government now concedes that § 2B1.1(b)(4) does not apply to Hoskins because he was "the operative actor" in the car theft ring, not merely a person who sells goods stolen by others. The government's concession does not bind the Court or relieve us of our "independent duty to decide the matter before us according to law." *See United States v. Perez*, 943 F.3d 1329, 1332 (11th Cir. 2019).  Nonetheless, as explained below, we agree the district court erred in applying the § 2B1.1(b)(4) increase.

Section 2B1.1(b)(4) of the Sentencing Guidelines provides for a two-level increase in theft offenses "[i]f the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property." U.S.S.G. § 2B1.1(b)(4).

In *United States v. Bradley*, this Court interpreted this special offense characteristic in § 2B1.1(b)(4) "to apply only to those defendants who sell goods stolen by others, meaning those who act as a 'fence,' and not to the actual thieves." *United States v. Bradley*, 644 F.3d 1213, 1287 (11th Cir. 2011) (citing *United States v. Saunders*,

318 F.3d 1257, 1267 (11th Cir. 2003)). Using that interpretation, this Court determined that the district court improperly applied the two-level increase because the defendant was a "thief and not a fence." *Id.* The defendant had "initiated the frauds, paying others to obtain drugs that he would later resell" and "could therefore be charged with the theft of most, if not all, of the prescription pharmaceuticals obtained at his behest." *Id.* Because of the defendant's operative role, this Court ruled that his role in the offense was distinguishable from a fence who simply receives and sells items stolen by others. *Id.*

Similarly, the district court here erred in applying the two-level increase under U.S.S.G. § 2B1.1(b)(4). Hoskins played an operative role in the car theft ring, which established him as a thief rather than as a fence. Hoskins was responsible for finding buyers for vehicles, directing his co-conspirators on which vehicles to steal, and providing instructions on how to properly steal them. Hoskins's text message stating that he was "running an organized car ring," further established his key role in the scheme. So, like the defendant in *Bradley*, Hoskins's role significantly exceeded receiving and selling items stolen by others. *Bradley*, 644 F.3d at 1287. The district court erred in applying the two-level increase under § 2B1.1(b)(4).

## B.    Increase under § 3B1.1(a)—Leadership-Role Increase

Next, Hoskins argues that the district court erred in applying a four-level increase to his offense level under U.S.S.G. § 3B1.1(a).

Section 3B1.1(a) provides for a four-level increase of a defendant's total offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).

The commentary provides that in distinguishing a leadership and organizational role from one of mere management or supervision, titles are not dispositive. *Id.* cmt. n.4.[2] Instead, courts should consider "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.*

This Court has held that control, influence, and decision-making authority over other participants requires more than mere orchestration of certain aspects of the conspiracy. *United States v. Martinez*, 584 F.3d 1022, 1028 (11th Cir. 2009). We explained that while orchestration requires organizing or coordinating a particular transaction, control involves creating, managing, or otherwise exercising authority over the transaction. *Id.* Additionally, this Court has held § 3B1.1 increases cannot be based solely on a finding that the defendant managed the assets of

---

[2] Neither party disputes the commentary's validity or interpretation of the guidelines text, so we need not delve into issues regarding the commentary's role vis-à-vis the guidelines' text. *See, e.g.*, *United States v. Mullings*, 166 F.4th 939, 953 n.5 (11th Cir. 2026).

a conspiracy. *United States v. Glover,* 179 F.3d 1300, 1302-03 (11th Cir. 1999).

Here, the district court did not clearly err in finding that Hoskins acted as an organizer or leader of criminal activity that involved five or more participants and thus imposing the four-level leadership-role increase under § 3B1.1(a).

First, as to the number of participants, FBI Agent Hubber testified that the text message in which Hoskins talked about how he was "running an organized car ring" was sent to five other people. Hubber also testified that five co-conspirators identified Hoskins as the leader of the organization. Furthermore, co-conspirator McCollough testified to the involvement of at least four participants apart from himself. In light of this record, the district court did not clearly err in finding that five or more participants were involved in the criminal activity, satisfying the participant requirement under § 3B1.1(a).

Second, the evidence at trial and sentencing supported the district court's finding that Hoskins was an organizer or leader under the factors set forth in the commentary to § 3B1.1. U.S.S.G. § 3B1.1, cmt. n.4. McCollough's trial testimony indicated that Hoskins exercised decision-making authority, was highly involved in planning and organizing the offense, and exercised control over the participants.

Specifically, McCollough testified that Hoskins was responsible for finding buyers for the vehicles, giving instructions to the several "runners" regarding when and how to steal the

vehicles, and paying the runners. McCollough also testified that when the runners stole a vehicle Hoskins had not authorized them to, Hoskins exercised decision-making authority and control over the runners in instructing them to abandon the vehicle and not paying them for the steal.

Hoskins's actions exceeded mere orchestration, as described in *Martinez*, because he actively created and managed transactions in finding buyers for the vehicles and instructing the runners accordingly. *Cf. Martinez*, 584 F.3d at 1028. Likewise, the relevant trial evidence, including Hoskins's instruction of runners and Hoskins's own admission in a text message that he was the one "running an organized car ring," demonstrates that the district court's finding that Hoskins was a leader was based on more than his management of assets. *See Glover*, 179 F.3d at 1302-03.

In sum, the district court did not clearly err by finding that Hoskins was an organizer or leader of criminal activity involving five or more participants and thus applying the four-level increase pursuant to § 3B1.1(a).

## V. CONCLUSION

For the above reasons, we reverse as to the § 2B1.1(b)(4) receipt-of-stolen-property increase but affirm as to the § 3B1.1(a) leadership-role increase. Hoskins challenges no other aspects of the district court's guidelines calculation. We vacate Hoskins's sentence and remand for resentencing without the § 2B1.1(b)(4) increase.

**VACATED AND REMANDED.**